May it please the court, I'm Laura Beshara and along with Mike Daniel we represent the Inclusive Communities Project. This case is about the Federal Low Income Housing Tax Credit Program in the Dallas area. The largest federal affordable housing program is the Low Income Housing Tax Credit Program and Congress gave Treasury the authority to regulate this housing program, not HUD. Treasury regulates it and administers it jointly with the state housing credit agencies just like HUD administers other federal housing programs jointly with local housing authorities. The tax credit program in the Dallas area is segregated by both location and occupancy. The facts of the segregation of these tax credit projects are uncontested. The tax credit program began in 1986 and by 2017 96% of those units were in segregated areas in Dallas and many of those neighborhoods subject to unequal conditions. The Office of the Comptroller of the Currency regulates national bank ownership of tax credits through the Public Welfare Investment Program. Without OCC approval a national bank cannot own real estate and it cannot own a tax credit project without this OCC approval and it must own the property in order to obtain the tax credit. This case involves the obligation to affirmatively further fair housing under the Fair Housing Act under Section 3608D. If you were to win, not just this, let's say you were to win the whole case, what would you want the district court to do in its order? There's many things that the judge could do. The judge could order both Treasury and OCC to regulate to affirmatively further fair housing. They could require the agencies to implement site selection regulations that would govern the location of the housing. They could provide guidance and they could direct and influence the location of the projects, not necessarily to where a specific result was achieved, but just to where there were opportunities outside of segregated areas available. It just seems so general and vague, which gets into this whole area of, you know, you really can't bring challenges to just suits. You basically are, if you're saying, we just want you to enforce the law better, you know, the courts have said there's really no standing for that kind of lawsuit. That's not this kind of case. This is a very specific obligation that is in the Fair Housing Act that applies specifically to executive agencies. And so the specific relief is what? I mean, if you're a Treasury official and you get this court order, what is it telling, what would it be telling you to do? It would be telling you to implement a site selection regulation. HUD implemented its own affirmatively further fair housing duty by doing that with respect to public housing. The regulation controls the development of public housing and the location of it. What would the site regulation provide specifically? It would provide for sufficient and comparable opportunities to examine whether there were sufficient and comparable opportunities for housing outside of minority concentrated areas. It doesn't prevent the placement of housing into minority areas. Do we know they're not doing that now? No, they're not. There's no evidence that they've ever done anything with respect to affirmatively further fair housing. They never tried to move any of the public housing out of the damaged areas or the? No, Treasury has never done anything like that with respect to the tax credit program at all. In the 30 years of the tax credit program. Whether there's a psychological effect in Dallas that they consider no site for construction of these facilities except in the poor neighborhoods where the people themselves now live? That is not the way the tax credit statute is written. The tax credit statute does provide for placement and a bonus for putting it into a high area of poverty. But that it only can happen if there's a concerted community revitalization plan implemented with it. Because of Treasury's lack of regulation of the program, all of these projects in Dallas were put into place without any concerted community revitalization plan whatsoever. It causes a severe discriminatory impact on the tenants involved because the housing is all located in segregated areas of unequal conditions. When you talk about ordering the Department of Treasury to regulate, are you talking about issuing a specific regulation as, for example, a regulation that would go in the CFR? Yes, that is something that they could do, but also they could take steps apart from that. Well, all right. But is there precedent for a court having ordered an agency to put a specific regulation in the CFR and prescribing what that regulation is and how it's worded? No, it would not be prescribing exactly what it was worded. You are correct, Your Honor. But the precedent is— Well, what would it sound like? What would the court's final judgment say that would tell Treasury officials specifically, even generally, what they're supposed to put in the CFR? The final judgment that a court would enter would look a lot like what was entered in the case of NAACP versus the Secretary of HUD, which is the leading case on affirmatively further housing. In that case, on remand, the court said, yes, it could have asked HUD to regulate, but it decided it didn't need to because HUD had decided to take other actions that met its obligation to affirmatively further housing, and that was remedial actions to use its own programs to open up housing opportunities outside areas of minority concentration. On remand, the case is NAACP versus Kemp, and that is where the remedy is set out. In this case— You talk a lot in your brief about the local veto, which is why you say these aren't being built in Dallas and in non-minority neighborhoods, and I guess that's the third factor the state agency looks at. How common is that as a factor, local support? Is that just a Texas thing, or is that in other jurisdictions? It's been found to be in jurisdictions all across the country, but in Texas, it has been put into state law, and it is the highest number of points is given for municipal support for a tax credit project. Therefore, if a developer does not get that support from municipality, then their uncontested evidence is that the projects do not get built. That is another one of ICP's injuries in this case, because ICP incentivized developers to build outside of minority-concentrated areas, and those projects specifically did not get built. What is the evidence about projects that developers wanted to build in non-minority areas but were not because they didn't get these points under the third criteria? There were specific applications in the record, and in the city of Dallas, six of the nine applications submitted were in white areas, and they were denied because of the local veto, because they could not get the support of the municipality. Over what period of time is this? 2009 to 2017. Do you have the record sites where that is in the record? I will get those for you. Let me ask you, whenever they're making these considerations of where to place these facilities, they include the cost of the land, I assume, and the fact that the land is more costly in places away from the poverty areas, does that factor have anything to do with the consideration of the city and the municipality to locate these? Yes, it does, and a regulation entered by the court would take into account local needs and local priorities. The evidence in the record shows that even with those high costs, there were developers in white areas that submitted applications for tax credits but were denied, but what a regulation by the court or guidance could do could say that the local priorities for consideration of an application can remain in effect, but they cannot be superseded by or overcome a federal requirement on affirmatively furthering for housing. But it seems to me, I mean, that this is an extremely complicated issue in terms of creating housing that would be affordable, and the more subject to integration of the facility, it's going to raise the cost to the people who actually need lower costs, and that if you move it away from, I mean, to newly developed areas, I mean, you get away from jobs, you get transportation problems. I mean, it just seems to me that it's much more complicated than just saying do it. Oh, it is complicated, and I agree, Your Honor, but the evidence in the record shows that ICP has been assisting voucher clients move into those areas for many years, that its actions have been impeded by the lack of tax credit housing in non-minority areas. Is there any record, any evidence in the record about success of those very few that have been constructed outside the minority areas? Yes, there is. ICP has assisted. Have they done well? Yes, they have, Your Honor. They've assisted thousands of clients. The problem is that there's not enough, that there are thousands more that want to move, and ICP is injured in its ability and is having to spend more money in order to get units into those areas. But what I wanted to talk a little bit about was the final agency action in this case, because the district court did not discuss what we think is the key precedent, which is Sierra Club versus Glickman, which, in that case, there was a failure to comply with a statutory mandate for 25 years, and that failure to comply was considered to be final agency action. Now, the provision at issue in that case is that the Endangered Species Act was enacted in 1973, and the Fair Housing Act was enacted in 1968, and those provisions are incredibly similar in terms of a broad duty to all federal agencies. And the parallelism of those statutes show that they have, that it is a specific statutory mandate, but it's not too hard to determine that the agencies can enact standards to comply with this. All of the, there are eight courts of appeals who have considered the Affirmatively Further for Housing obligation of HUD, which is similar at issue for the other executive departments in this case, and all of them agree that that meaning of Affirmatively Further for Housing is more than just not discriminating. It means to taking affirmative actions over time that will begin to dismantle residential segregation and open up housing outside of minority-concentrated areas. When the act was passed in, what, 1968, you say? Yes. And has integrated housing significantly improved since then? There has been integrated housing. Yes, it has improved, but what it has not improved in is in the low-income persons of color are still significantly subjected to— Which is the subject of our discussion today. Yes, sir. It seems like part of the problem that this suit is getting at, I mean, there's just some tension between the Fair Housing Act. Its goal is eliminating segregated housing. These low-income tax credits, part of their purpose is to help development in poverty-stricken areas, which in a lot of areas are heavily minority, so it seems like there is just some tension between the goals of these two statutes. Well, part of the Fair Housing Act goal was to help create better conditions in minority-concentrated segregated areas. And the tax credit statute, you can only put the tax credits in these high-poverty areas if there is a concerted community revitalization plan, and the record shows that these units were put there with that. So part of the affirmative for the Fair Housing duty would have been to require a revitalization plan that would have revitalized these areas or helped work toward that goal. And then that housing could possibly become available for ICP's clients if it wasn't in such conditions of high distress and had been revitalized. ICP has established its injuries by undisputed facts in the record and has standing both against Treasury and OCC. Those injuries are that ICP had to spend more money and resources to find units in non-minority areas because of the lack of tax credit units in non-minority areas. How do you spend that money? For example, what would be the expenditure? Well, ICP spent $3 million from 2008 to 2017 in the amount of security deposits and landlord bonuses on private landlords to accept their clients because of the lack of tax credit housing. If there had been tax credit housing there... You spent that money? I'm sorry? You spent that money. Yes, ICP spent that money, yes. If there had been tax credit housing there, ICP would not have had to spend nearly as much money because those units are required by law to not discriminate against voucher holders and do accept voucher teams. How many were you funded by? The ICP is funded by the Walker Housing Charitable Trust Fund, Your Honor. It's a remedial fund... You get the federal money. No, sir. It's a remedial fund for the public housing desegregation case. Another injury that ICP suffered was because of the local veto that was in effect. ICP incentivized developers to build in non-minority areas, but those projects did not get built because of this local veto, and therefore those units... Your time has expired, but you can have 30 seconds if you'd like to to finish your opening argument. I do not promise. All right, thank you. You've saved time for rebuttal. Mr. Koppel? May it please the Court. I'm with the appellate staff at the Civil Division of the U.S. Department of Justice, and I'm representing the Appellees, Department of Treasury, and OCC in this case. I don't have a great deal to add to the colloquy between the Court and counsel and our briefs on the district court decision. I would emphasize that there are a number of insurmountable problems with the plaintiff's position here. First of all, with respect to the relief, plaintiff's counsel was emphasizing the possibility of a regulation. Well, the plaintiffs could, if they chose to do so, petition for such a regulation and secure review of it if the agencies declined to adopt it, but they have not done that. They do refer to a petition for rulemaking that I believe they filed in 2008, but that is not what they're actually challenging here. As the Court correctly pointed out, what they are bringing is a much more kind of global, programmatic challenge of the sort that it's clear from the Supreme Court's decisions in the National Wildlife Federation and Southern Utah Wilderness Alliance, they can't bring at all under either the 706-2 or 706-1 of the APA. This is just the, and the case that they rely on, the Sierra Club v. Glickman, they're relying essentially on a footnote in that decision that said that the United States had argued this cursorily and rejected it, but that decision is, if not explicitly overruled, certainly at the very least called into question by the Court's en banc decision two years later in another case, Sierra Club v. Peterson, in which the en banc court made it clear that the sort of global challenge at issue in that case, which involved the even-aged cutting of timber in national forests, could not proceed either, that the way that the plaintiffs there would have had to proceed would have been by challenging individual timber sales, and that's not what they did. And Glickman is further distinguishable because in Glickman there really was a discreet action that they were challenging. There was a requirement that the agency, that the Fish and Wildlife Service, that USDA consult with the Fish and Wildlife Service, which it had not done. And so this case is much more similar to Peterson than to Glickman. As I understand it, I'm shifting here to something slightly different. As I understand it, the district court at least tentatively conferred standing on treasury. Yes, sir. In your view, was that decision correct? I understand that the result was favorable to you and you wish for us to affirm, but address the question of standing and particularly redressability as to treasury. Yes, Your Honor. We do believe that the district court erred with respect to standing against treasury, and essentially because the reasons with respect to treasury were the same as with respect to the OCC. Plaintiffs failed both the causation and redressability prongs of the standing test against both agencies, and the treasury situation is virtually identical because there, too, it's entirely speculative whether their injury would be redressed by the relief they're seeking because it all depends on the actions of third parties, from the state housing authority, the project sponsors, the project investors, and also private landlords. Whichever way you slice it, there should be no standing here against either of these agencies. On OCC, it's even clearer because OCC regulates such a small slice of the pie, and national banks and related institutions, and there are so many other potential investors involved. But also, regarding treasury, the relief that they're seeking, the kind of general regulation that they're seeking, there's no assurance whatsoever that that would actually change facts on the ground, or that it would be likely to change facts on the ground, that it would be likely to result in more projects being located in the areas where they wanted to. And the Supreme Court highlighted it again. This underscores Judge Costa's point about the tension in the statute because in their companion case that went to the Supreme Court, the Supreme Court noted that tension and said that the basic problem is that the statute favors placing projects, using these low-income housing tax credits, in the very areas that the plaintiffs object to. And so, this is really, it's an insoluble conundrum for them. And this case is, further, this is also the tail wagging the dog because their principal case, which is the one that they brought in 2008 against the Texas Department of Housing and Community Affairs, that was the one that went to the Supreme Court, there they were litigating against the agency that had much more responsibility under the statute for allocating low-income housing tax credits. And they ultimately failed. Their claims against the state agency were ultimately dismissed. This action, which was brought in 2014, and it really comes across as essentially an afterthought against agencies that are much more, federal agencies that are much more further removed from the discrimination, the alleged discrimination in the location of these projects that the plaintiffs are complaining about. So, I'm happy to answer any further questions from the court, but I believe that we have covered the issues in our briefs, and unless the court has further questions, I would urge the court to affirm. Thank you, Mr. Cobble. Thank you. Cheryl, you saved some time for rebuttal. This is not the same case as the ICP's case against the state agency at all. ICP could not have brought this case against the state agency. This speaks to the obligation of the agency's, in this case, the executive agency's, Treasury and OCC's obligation to affirmally further for housing and the purposes of the For Housing Act, which has been established by the Supreme Court to be broad purpose. Council for Treasury and for OCC said that it would have been okay if ICP had asked the agencies for a specific petition for rulemaking, and ICP did that in 2008. It submitted a petition for rulemaking to Treasury, and it asked them to enact an affirmably further for housing regulation, specifically for the tax credit program. In that petition, ICP informed Treasury of the extensive segregation in Dallas, in the Dallas area, in the state of Texas, and in the nation, and Treasury asked ICP to withdraw the petition. What was the regulation going to say if they had agreed? Regulation is set out, and it is in the record in the petition, and it says it follows very carefully NAACP versus Secretary of HUD. It says that it requires in the examination of the project location criteria for the agency to take into account affirmably furthering for housing obligations and to assess the courses of action that would open up housing outside of segregated areas and assess negatively those actions that would violate that. I would refer you to the petition for rulemaking that is in the record because it sets that out further. That's what they do now, really, isn't it? No, they do not assess at all. They take none of these obligations into account. Treasury and OCC do none of this. It's like they're painting with a broad brush to me. Sierra Club versus Glickman has been cited by this circuit and by other courts and is still good law, and it is still applicable after the Supreme Court Norton case because it has been referred to in other cases involving HUD's obligation to affirmably further for housing, and it's still applicable. Sierra Club versus Peterson is not this case because in Peterson there had been action by the agency that was being challenged. Here there's been no action at all by either agency. There is standing, ICPS standing against OCC as well as Treasury. OCC has complete and total regulatory control over banks and can control their behavior. In addition, ICP offers significant incentives to bank development of tax credit housing. What are we to do as a court here to remedy and to address the injuries that you are talking about? We're certainly not expertise. We have no expertise in this matter to accomplish this. I understand, but if you look at NAACP versus Secretary of HUD, the court says it could be difficult, but this is what courts are designed to do to remedy violations of the law. But that was an extensive regulation, was it not? No, they did not require an extensive regulation. They required remedial actions and consultation with the agency. They did. The agency was consulted in terms of earlier. That's all the housing regulation requires is consultation? No. The remedy in that case requires more than that. It requires— Not to make you spell it out, but I'm just saying it would be helpful if we knew what we were doing. If we address your injury. For example, what HUD's site selection regulation does that governs the siting of public housing, it requires an examination of whether there are significant and comparable opportunities for housing outside of minority-concentrated areas before placing it in minority-concentrated areas. It requires the agency to look at that affirmatively. So what you're suggesting and telling us, I suppose, is that if we rule in your favor, you want us just to adopt what HUD has said and apply it to you? That could be one thing to look at, yes, Your Honor. That could be one thing to look at. Okay. All right. Thank you. And all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.